All rise. Oh yes, oh yes, oh yes. The Honorable Appellate Court of the 5th District of Staten Island is now in session. Please be seated. First case on the docket today is 5-13-273, Gale v. Greesfelder, Gale. Ready to proceed, counsel? I'm trying to hurry a little bit because I think the snow is on its way. Good morning, Your Honor. My name is Mike Merkman. I represent the appellant defendant, Greesfelder, Hemker & Gale. With me today is my co-counsel, Robert Sprague, along with my partner, Ted Dennis. This is an appeal from the trial court's order compelling production of documents that are on the work, on an attorney's client's work product privilege. The court orders that all the documents on the privilege law be produced. As an initial note, there were a number of allegations contained in the appellant's brief which we believe are untrue. However, you do not need to decide the truth or falsity of those allegations in the version of the trial court's decision. The trial court's order is based upon the assumption that if a law firm violates a duty to a former client, that that former client gets the file of a different client. Now, in making their argument, the appellees at the trial court level allege two possible exceptions to the attorney-client privilege. The first exception was the common or joint representation exception. And in this manner, that relates to a 2003 negotiation which took place between SSM, which is also one of the defendants in this case, and CSA for a contract to DePaul Hospital. This negotiation took place in 2003. During the negotiation, one attorney from Greensfelder represented the hospital and a different attorney represented the CSA, the surgical center. This was with consent and permission of both sides. And in this situation, the information was kept confidential from both sides. The information which was given by SSM to the attorney was kept confidential. The information which was provided by CSA to the attorney was kept confidential. The important point about the common representation exception is if that is found to apply, the period during the common representation, there is no privilege. The documents requested by the appellees at the trial court level were created and came into existence three years after the negotiation ended. So the common representation had been over for three years before any of the documents requested came into existence. The second point on that, and we'll elaborate a little bit further on it, that this was actually not a common representation but something that would be called a simultaneous representation. Those are two different things, and I'll explain the difference in those in a little bit. The second exception that the appellees alleged at the trial court level was the crime fraud exception. As an initial note, the trial court's order made no determination as to whether or not a crime fraud or a breach of fiduciary duty had occurred in this case. The plaintiffs in asserting the crime fraud exception claimed that Greensfelder was committing the crime and that SSM was assisting in the crime. But that is not how the exception applies. The crime fraud exception applies is when the crime or fraud is committed by the client and the attorney is assisting the client in the commission of that crime. Similar to the situation if a client came and told an attorney, I murdered somebody and I want to bury the body, and the attorney assists. No court has ever found a situation that the plaintiffs are asserting in this case where it's the crime of the law firm and the client is assisting, which would be a basis for the crime fraud exception. No court in any place has ever found that. Now turning back to the common representation exception to the attorney-client privilege, this applies when two clients are represented by the same attorney. And this happens quite a bit in our practice. In medical malpractice cases, it's very common for one attorney to represent a physician in a corporation or likewise on a truck accident case. It's very common for one attorney to represent a truck driver in a truck company. And in these cases, there are common or joint offenses. What's important, and I pointed out earlier, is the common representation exception only applies during the period of the common representation. It is undisputed in this case that the documents sought by the plaintiffs came into existence over three years following the end of that common representation when the plaintiffs called the common representation. And that fact alone would be sufficient for the court to reverse the trial court's order. I mentioned earlier that we do not believe that this is a common representation but rather a simultaneous representation. There was no lawyer from Greensfelder who represented both CSA and the hospital. For the negotiation for the 2003 DePaul contract, it was at CSA's request and with their consent that CSA was represented by one Greensfelder attorney and the hospital was represented by another attorney. Are you saying that it has to be one attorney? Cannot just be the same firm in order to qualify for a common or joint representation exception? I think that goes to more of what the client's expectations are. In a common representation situation, there's no expectation by the clients of any confidentiality. If I'm representing a physician, a corporation, there's no expectation that anything mentioned to the attorney would be privileged. However, in a simultaneous representation, there is the expectation by both parties that the information will be kept confidential. In fact, that's an allegation that's contained in the plaintiff's complaint, that it was their belief that the information was to be kept confidential. That fact alone means that there wasn't a common representation or a joint representation but a simultaneous representation. As a final note on the common representation exception, the plaintiff in their complaint has alleged that Greensfelder committed a breach of fiduciary duty by providing confidential information to SSM in the 2007 lawsuit involving the anchor physicians. However, if the common representation truly applies, there is no confidential information. There's no expectation that the information is confidential, so there's no way that Greensfelder could have breached any duty by providing information to the hospital because none of that information would be confidential if, in fact, there was a common representation or a joint representation. With respect to the crime fraud exception, the Miller case, which I think is probably the leading case on that in Illinois, states that this applies when a client commits a crime or fraud and the lawyer helps perpetrate that crime or fraud. Initially, I will point out that at no time has there been any determination by any court that there was a commission of a breach of fiduciary duty by Greensfelder. The trial court never made that determination. In fact, the order doesn't even reference the crime fraud exception. It references the common representation exception. So initially, there's been no determination of any crime or fraud committed by Greensfelder. The plaintiff's complaint alleges that Greensfelder was the one who committed the crime and that SSM assisted in that. However, the exception only applies when it is the client committing the crime and the law firm is assisting in that crime. And that's because the privilege in this case belongs to the client, belongs to SSM, and they need to show that SSM was the one committing the crime. They have to show what was in SSM's mind in hiring Greensfelder and that they had an improper motive in hiring Greensfelder. There's been no findings of fact, no evidence of that whatsoever. In fact, they don't even allege in the complaint that SSM committed the crime. There's no place in the complaint. As I mentioned before, the plaintiffs have to show, the appellees have to show, that the crime was committed by the client and that the law firm assisted. There's been no case that's ever found the other way around, that the crime was committed by the law firm and that somehow waives the privilege to the client if they're not the one actually committing the crime. Regardless, if the court looks at the common representation or looks at the crime-fraud representation, the trial court's order must be reversed. In looking at the specific order that was entered by the court in November of last year, it has basically three statements. One is there was a question of fact as to the relationship between Greensfelder and CSA. The second was there was a question of fact as to common representation. And the third was there was a question of fact whether or not the attorney-client privilege was waived. All of the cases in Illinois, specifically the Miller case and the Center Partners case, provide that there must be a determination by the trial court that the exception applies. By the very wording of the court's order that there were questions of fact, the appellees did not meet their burden. The court has to make a determination that the waiver exception applies, and by the court noting that there was a question of fact, the plaintiff appellees did not meet their burden. Based upon the foregoing, we would ask that the trial court's order requiring the production of all of the documents on the appellant's privilege law be overturned in perspective of further relief. Thank you, Justice. Can I please report to counsel? We'll talk back. Because I think it's very important that Mr. Paulson get home before the snow flies. He's an old, bad driver. And so we owe it to the citizens of the state of Illinois to get him off the road. We're talking about two different cases here. You know, I find that happens to me more and more as I get older. We're talking about two different cases here. Now, let's be clear about something. First off, this common representation thing, let's put this over here on the side, because that does form part of the basis for the trial court's order, but it forms a basis for the trial court's order as it related to that period of time when there, in fact, was common representation, and that was during the drafting of the DePaul contract. Now, what I find so extraordinary, although it's not surprising, is that counsel hasn't talked about the facts. Let's talk about the facts. And before we talk about the facts, what we first need to do is we need to determine whether or not there are two or three guiding legal principles, which I respectfully submit would dictate where the court will go when we start applying the facts to this case. One of those guiding principles is that a breach of fiduciary duty in the state of Illinois equals fraud for purposes of the crime of fraud exception. That's fact number one. That's a fact. I mean, Miller says that. Decker says that. Every case has said, you breach of fiduciary duty in your client, you have committed, in effect, fraud. That's crime of fraud. Now, there's no question that there have been allegations, and the issue is going to be whether or not there's been a crime of facial showing sufficient to demonstrate whether or not, because that, unfortunately, is not only what Miller holds. That, more importantly, is what Decker holds. Decker controls Miller. And, of course, as everybody probably knows, the Supreme Court addressed this issue after briefing was closed in a case called People v. Raddatz, R-A-D-O-J-C-I-C. It holds the same thing. So what we have to do is we're going to have to show you folks that we can make a crime of facial showing if we've shown the court. Because when the trial court said question of fact, what the trial court is saying is you have made a crime of facial showing, in my judgment, that there has been a crime of fraud exception. Now, where does it come from? Does the client have to do something? Absolutely. Absolutely. So let me tell you how you get there. Breach felon breaches their fiduciary duty to date. Number two, as it relates to the client, SSM, and this is where the hook is, and it's very, very important that this be clear. In the state of Missouri, which is what governs SSS County, civil conspiracy has been found equal to fraud. Civil conspiracy equals fraud. The citation is Dickey v. Johnson. That case specifically holds not only does Missouri recognize the crime of fraud exception. I'm not even using the word crime. Let's just use the word fraud. But in addition, it specifically says that conspiracy equals fraud. Now, where is it? He says, wait a second. It says the client's got to be the actor. Yep, I agree. Now, I have a hard time remembering names, and so here's what I'm going to do with the court of probation. I'm going to refer to SSM as the devil. I'm going to refer to Riesfelder as Faust, and I'm going to suggest that Faust made a deal with the devil. And the deal that they made with the devil is that they agreed to conspire to breach their fiduciary duty to date. How did they do that? It's pretty darn easy when you stop and think about it. The position that was taken in this case by Riesfelder and by SSM is so simple. They basically took the position that we, meaning Riesfelder, drafted non-compete clauses, non-compete clauses for daily benefit. In addition to that, we drafted non-solicitation clauses for SSM's benefit. Those went back to the DePaul hospital. That's what we're going to get in the common representation. And then what happens after that is Riesfelder then comes in on behalf of SSM and takes the position that the non-compete clauses that they drafted that were designed to protect daily and his group are no longer enforceable. That's what they did. That is a conspiracy to violate fiduciary duty. That, ladies and gentlemen, is the fraud. And the only issue that we have in this case is have we made a crime of fiduciary duty showing to the trial court that, in fact, that's what they did. That's the fraud. The fraud is that SSM conspired with Riesfelder to cause Riesfelder to breach a fiduciary duty they had to deal with. And it's not based on common representation. It is based on simple decency. You flip sides. The rules of professional conduct said you don't get to flip sides. They drafted a contract for making them. They took a position. Later on, when SSM wanted to have the exclusive rights to all of these cardiothoracic surgeons, they took the position that the very contracts that they drafted weren't enforceable. Now, here. Here's where it gets really interesting. Therefore, what the issue is in this case is that Judge Lopino had a crime of fiduciary duty shown. Was there a question of fact? Because that's the issue of crime of fiduciary duty, right? Under Miller. And Decker. All those cases. To say that they conspired with SSM to attack the validity of an IEP clause they had drafted while representing Bailey, and they did it for the benefit of SSM. The timesheets, pleases the members of the court, are part of this record. That's part of the crime of fiduciary case. We haven't got 800. I mean, there's 800 pages of additional documents they're not going to show us, but we do have this. We have a document that says, in 2003, Kathy Randolph, on behalf of Rietzfelder, drafted a non-solicitation clause for Bailey and charged him for it. We do have, in addition to that, the Kathy Butler. Again, if you want to talk about common representation, to answer your question, Justice Chaffin, Kathy Butler talked to Bill Bailey about the DuPaul contract back in 2003 and billed him for it. Now, if that's an adversarial relationship with the person who becomes the chief litigation person in the later lawsuit, when you're trying to avoid the competition clauses, talk to David about the non-competition clauses, I think that that kind of gets a little icky. Now, let's go forward. In 2003, David Harris, he's kind of the guy from the Rietzfelder, and he's kind of the guy who kind of runs all of this. Conference with Kathy Butler, this is in 2003, regarding changes to contracts. Review our new revised draft of surgery services agreement. They wrote the contract, and here's why. Bailey had to understand it. Bailey, who's a doctor, but their doctors are lousy physicists, and they just are. And the reality is that he's a business guy, but he's a cardiothoracic surgeon. Those guys have to have a team. They've got to have a profusion. They have to have operating room nurses. They have to have all of these people who are part of their team. And so he puts a big investment in this group. That's why he wanted these non-compete clauses, because he has these doctors, he brings them in, and then he has to furnish them with a team. Well, come along, and it's moving along, and we're working along just fine. He's got these doctors. They're operating pursuant to contracts drafted by SSM. I'm going to strike that, by Rietzfelder. And then come along in 2006, and then also in 2003, you also had a situation where Rietzfelder's representing the hospital DePaul, which is where these common contracts were drafted. Now, the only thing we believe should be produced pursuant to the Common Representation Doctrine are the documents that grew out of that contract. But all of the other documents that should be produced should be produced growing out of the conspiracy to what? To violate the registry duty. That's the fraud. And so then as we go forward, after we have all of this 03 stuff, which is part of the record, C726 and C727, and then we've got C728, it says here, telephone conversations, Kathy Butler, with Dr. Daley regarding the DePaul Health Center agreement. I mean, there's another one. Strike that. Lengthy conversation with Bill Daley regarding business opportunity issues. Now, let's put 06. Now, here's what happens in 06. What happens in 06 is that then what happens is they split it off now. No longer is Rietzfelder represented. But they still have a duty. They've got a duty going on what they did and took their money for back in 03. So now comes along 06. And what happens at that point is two of the doctors whose names I don't remember. I see a door or something. I'm going to call them Benedict and Arnold. Doctors Benedict and Arnold decide they want out. Or stated otherwise, SSM wants them out. Why? Because SSM makes more money. If what? If they get the doctors employed as opposed to having to do business with Daley and his group. So what they do at this point, which is what this lawsuit is all about, they get together and they decide they're going to void the contracts with the non-competing and the non-solicitation clauses that they drafted back in 03. And these bills prove a prima facie case that that is exactly what they did. And so the court will look at pages C, 619, 627 through 630. I mean, these bills are just replete. It's the same players, Your Honor. It's Butler. It's Chesna. And here's the killer. Christine Randall, who drafted the non-solicitation clause, is sending bills to SSM talking about litigation strategy against Daley. CSI. It's all in here. And so that's what Judge Lopino had when he said there's a question of fact here as to whether or not there has been a conspiracy to violate the fraud. And there has been. And so if you go through these different things, you'll see. And it gets better. Because don't make any mistake about it. When you look at these bills, not only are you going to see that there are conversations between all of these Greens fellow lawyers and SSM people. Because that's who this guy, Mr. Grouse, is. So there's no misunderstanding as to who is the bad guy here. It's that the bad guy here is Grouse. Grouse is pulling the strings. We believe the evidence is going to show, which is why we've sued them both, one for conspiracy, SSM, and the other for breach of fiduciary duty, which, of course, is Greensville. But it's the conspiracy to breach. Grouse shows up in all of these things where they're reporting back to him. But here's where it really gets messy. The two doctors, Benedict and Arnold, are represented by Mark Goldenberg. Okay? He's hired. He's hired by these guys. SSM wants these guys out of their country. Now, what they have now done, if you look at these timesheets, is that there are meetings. I mean, Greensville is charging SSM for meetings, conversations, and communications with Goldenberg. They're working together. They are coordinating this lawsuit to set aside the non-compete clauses that they drafted for nearly years ago. That's not right. You're not allowed to do that. And for heaven's sake, if you've done it, you're not allowed to then hide behind the documents by claiming a privilege. Because, as this court well knows, is that privileges, because of what they do, they prevent otherwise relevant and admissible evidence from being disclosed. Therefore, it is a departure from the general duty to disclose and must be strictly confined within the narrowest possible limit, which, of course, is waste management. And in this instance, guys, it's just that if you look through these bills, you are going to see that they are talking to Goldenberg, their coordinating litigation treasurer. Now, let's turn to Donald Patterson. The question is, was there primary facial showing? The other thing that Judge Loeben will have is that he had, in addition to that, he had a document which is dated, which has number C-618. And this is a memo that SSM, an internal memo that SSM wrote. And they are bragging. They are telling people at the hospital. They said SSM has elected to join the lawsuit filed by Goldenberg on behalf of Benedictine Army to get out of these non-compete clauses. We've objected to join the lawsuit to our future heart surgery program for our patients and physicians. We are hopeful that this approach will help resolve the matter quickly. They joined up. That's primary facial evidence of a conspiracy to commit fraud and, more importantly, to breach fiduciary duty. And on top of that, here's where it's even better. Throughout this entire time, SSM is stringing these guys along, making David's group believe that they're going to be hired as the network provider for all the SSM hospitals. So here's a letter from Grieffelter. While they're plotting litigation strategy on October the 4th per the bills, here's a letter from Grieffelter on the 26th saying, We're still seriously considering making you the network provider. At the same time, on October the 4th, they're having bill strategies with all of the same lawyers who were involved in the original drafting the agreement back in 2003. It's the same character. Butler, Chestnut, Randolph, Harris. And so then here is a letter from Butler saying, We're still interested. Keep it in play. And at the same time, they're plotting to file suit. And what's the suit that they file? Goldenberg files on behalf of these two doctors. And what's he file? He files a lawsuit to set aside the non-competing lawsuits. And he says, They're no good. We can't have them. Because why? Well, I don't know why. I mean, but he files this lawsuit. And then at that stage, again, 11 days later, SSM files a petition to intervene. And they join in that lawsuit. And the position that they take in the lawsuit is what? You already know. The non-competing lawsuits that they drafted should be violated. They violate. And they actually ask for an injunction to enjoin. You can't switch sides. And so the court had that evidence in front of them. Again, crime of facial case. The other thing that's really troublesome is that when this lawsuit is going on, Danny Vidal ultimately settles it. He settles it on the cheap. He settles it on the cheap because suddenly the light goes on in his head, or his lawyers, and they say, Wait a second. Go on. I mean, Greenfelder, they're cheap. I mean, they're playing both sides here after they've made their appearance. And so then Greenfelder comes in and they say, No, we have this wall. We have the shields, incidentally. He said, Leave them. It's a so-called shield. But the shield is breached. And you can tell the shield has been breached over and over again by the billing records. But on top of that, they actually make a representation to the court. They said to the court, they said that Greenfelder's record, the daily, had actually weighed the conflict. And that, of course, is baloney because Judge Lopino had that in front of him because what we come to find out later, not at the time when they settled, but later in the course of this discovery, in this lawsuit, is that they sit here. They said, Sorry, we looked. We can't find the conflict waiver. There wasn't one. That's also part of the record. The court didn't have that. But that's starting to leak out now. But they don't want us to have any of the documents about the so-called conflict waiver. The other thing that was unbelievable is all along this was never a negotiation in good faith because if you look at the documents, SSM and Greenfelder had already agreed on a list of non-negotiables. And you know what the non-negotiables were? All of the non-competing clauses had to be voided. All of the non-solicitation clauses had to be voided. Daily had to basically say, I surrender. I'll become your employee. After he, of course, had bargained for it, had invested all this money in all of these documents. And why is it? Real simple. It's all about money. SSM could make so much money. There was never a problem with Daily's workers, services. They loved him. They just didn't like the structure. They didn't like the structure. They didn't like the fact that these doctors were reporting to him and that he had control over the profusionists and the nurses. That's something he had bargained for. And it's something that they and SSM had worked together on with respect to the DePaul contract and the St. Joseph's contract. From 2003 to 2006, they got along fine. But then at some point, as health care has changed, SSM decided, uh-uh, we don't want to do this as a CSC. So that's why, when I suggest to the court, it's to sit there in bed in this instance of adequate time. You say that they say that the guy didn't use the crime-fraud exception. First off, this is de novo, as we all know. Decker says that. And incidentally, Miller has really been abrogated to a large extent by this other case, but abrogated not for its whole. Because if someone were going to say that we had to actually prove the other people about crime-fraud, think about how silly that would be. How can we prove crime-fraud for purposes of getting the privilege if we don't get to have the documents that prove it? That's what the use of the word is. That's what Decker always said. Decker said, you don't have to make a complete show, you know, a finding, if you will, that there's been a crime-fraud. What you have to do is exactly what Judge Loebl did. Say that there's a question of fact. Question of fact equals what? Crime-of-patient is what is required under Decker, and it's certainly required in the Newspaper Court case. Have we made a crime-of-patient case that there has been a conspiracy to violate their duty? And if you look at the timesheets, the memos, the lies about the shield, the conflict waiver lie, the SSM memo bragging, also the ethical wounds that have been trained. I mean, there is an ethical rule, 1.9, it says, and it uses this as an example, Your Honors. It says, for example, a lawyer cannot draft a contract for one former client and then take a position with a later client that the original contract they drafted is void. That is the example given in the comments section of the Rules of Professional Responsibility 1.9. And in addition to that, it says that if you talk about what was in it for SSM, yeah, I really believe it was for SSM. I want to thank you for your time this time and until next time. Thank you, Counsel. Thank you, Your Honors. There was a lot of talk by appellees of counsel about their making a crime-of-patient showing of a breach of fiduciary duty. There has been no determination by anyone that a breach of fiduciary has occurred. This issue was before Judge Gardner in the St. Louis case. CSA had filed a motion to disqualify Greensville. This motion was briefed and was argued before Judge Gardner. There were two issues before Judge Gardner, whether or not this was actually substantially related. And the second issue was the nature and extent of the consent. There's no question. Plaintiffs admitted there was a consent in 2003. There's no question. From 2003 to 2006, Greensville represented the hospital against CSA. They had daily, weekly, monthly matters ongoing. And every time Greensville represented the hospital, CSA had their own attorneys. At no time did they ever object to that arrangement. At no time did they ever withdraw their consent or limit their consent. That issue was before Judge Gardner. He heard the issue and he declined a ruling on it, which could be implicitly means he denied it. He basically told the parties to go back and negotiate. Judge Lobedo has never made a finding that there's been a prime showing of a crime fraud. His word is completely void of any language about that. There was no evidence put on about SSM's intent. There are some billings from Greensville, but there's no documents from SSM. There's not one document that would indicate that they were perpetuating or were involved in a conspiracy. Mr. Keith spent a lot of time talking about the position that the hospital took with respect to the non-compete agreement and the contracts. SSM did not take the position that the contracts were improperly written or that they were somehow overbroad in time or distance or type of field you could practice in. What they took the position was is after those contracts were written into, certain actions by Dr. Daley and CSA were against public policy and made those contracts void. That's the only position they took. They didn't say the time limit was too long. They didn't say the distance was too broad. They simply said that actions taken by Dr. Daley after they stopped representing him was the basis for voiding those contracts. At no time did they ever say that the contracts were void because of inside information or not being drafted properly. What the plaintiffs cannot show is that there has been any confidential information passed from Greensfelder to SSM that they obtained from CSA. At no time in any of the pleadings in the underlying case was there any inference that secret information was provided. During the settlement negotiations which lasted all day, at no time was there any indication that any confidential information was provided by Greensfelder to the hospital. There is absolutely zero proof, there is zero evidence that any confidential information went from Greensfelder to the hospital. There is no evidence because it just simply didn't occur. The meetings that Mr. King referenced in the bill, what that was was when it became apparent that the four anchor surgeons were having difficulties with the hospital. They started exploring their options. One of the questions was what was the nature and extent of the consent given by the Daley's back in 2003. I don't know that I pointed it out on my opening, but Dr. Daley's wife Sharon Daley was a partner of Greensfelder, was a partner of Greensfelder for a number of years. She's a very sophisticated attorney and she was the one that was involved in agreeing to this simultaneous representation. To say that Dr. Daley was somehow unsophisticated is completely untrue. At all times he had his wife working with him as an attorney who was a former partner. But getting back to what the evidence shows, plaintiffs cannot show anything that CSA, I'm sorry, that Greensfelder did that hampered them in the underlying case in St. Louis. There was nothing done with the pleadings. There was nothing suggested in the settlement negotiations. At best what may have happened, and we deny this happened, is that Greensfelder gave SSM confidential information and it was not active. But that didn't show either. But that's the best they can show. They cannot show any evidence that confidential information was passed from Greensfelder to the hospital. Thank you, counsel. The case will be taken under advisement of the students. The court will come into court. Thank you.